## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Special Agent Eric D. Poalino, having been sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been since June 2021.  I am currently assigned to the Boston Field Office, North Shore Gang Task Force ("FBI Task Force" or "NSGTF").  The primary mission of the FBI Task Force is to identify, investigate, disrupt, and dismantle violent criminal organizations operating in cities north of Boston.  My responsibilities include the investigation of possible violations of federal law, including illegal possession/transfer of firearms, firearms trafficking, narcotics trafficking, and violent crimes involving firearms and narcotics trafficking.  I have received training and experience in various aspects of criminal law and procedure, including electronic and physical surveillance, interrogations, stops, searches, seizures, and arrests for a variety of criminal offenses. Through my training, knowledge, and experience, I have become familiar with the habits, methods, routines, practices, and procedures commonly employed by persons engaged in the use and trafficking of illegal firearms and narcotics, including persons involved in criminal organizations. My investigations have included the use of surveillance techniques and the execution of search, seizure, and arrest warrants.

2.      All dates, time and amounts set forth in this affidavit are approximate.  Because this affidavit is being submitted for the limited purpose of securing the requested criminal complaint, I have not included each and every fact known to me concerning this investigation.

## I.      PURPOSE OF AFFIDAVIT

3.      I make this affidavit in support of a criminal complaint charging MANUEL SANTANA-SOTO (dob: xx/xx/1990) ("SANTANA-SOTO"), and JOSE VASQUEZ LANTIGUA (dob: xx/xx/1978) ("LANTIGUA") with violating 21 U.S.C. § 841(a)(1)

(manufacturing of a controlled substances and possession of a controlled substance with intent to distribute), and 21 U.S.C. § 846 (conspiracy to manufacture, distribute, and possession with intent to distribute, a controlled substance) on or about August 28, 2025.

## II.    PROBABLE CAUSE

4.      On August 28, 2025, FBI North Shore Gang Task Force (NSGTF) executed federal search warrants 25-8422-PGL and 25-8421-PGL, authorizing a search of the second and third floors of 18 Carleton Street, Methuen, Massachusetts ("18 Carleton Street" or the "TARGET LOCATIONS"). The charges being sought for MANUEL SANTANA-SOTO, and JOSE VASQUEZ LANTIGUA relate to the items recovered during the search of 18 Carleton Street, Methuen, Massachusetts.

5.      18 Carleton Street is an address located within the structure of 16-18 Carleton Street. 18 Carleton Street is comprised of two separate apartment units. One unit of 18 Carleton Street is on the second floor. The other unit of 18 Carleton Street is on the third floor.

### A.    ARREST OF JOSHUA MORALES

6.      Prior to the clearance and searches of the units within 18 Carleton Street, investigators recovered a large amount of suspected controlled substances in the form of counterfeit Percocet pills believed to contain fentanyl from the person of JOSHUA MORALES. MORALES was arrested and has since been charged with a federal drug offense in Docket No. 25-MJ-8424-PGL.

7.      Prior to his arrest, MORALES was observed entering, and after a short time, exiting a side door to the TARGET LOCATIONS. As MORALES exited, he was now carrying an orange bag that he did not carry into the premises. The same orange bag was then located in MORALES' vehicle. When searched, the orange bag was found to contain approximately 10,000 counterfeit Percocet pills. Based on the observations and investigators knowledge during the investigation,

investigators believed that MORALES had obtained the drugs from the third-floor apartment of 18 Carleton Street. Photographs of the bags containing the Percocet pills seized from MORALES's vehicle at the time of the arrest follows:



8.      Based on MORALES behavior when he arrived at Carleton Street, including sitting by the door and waiting, investigators reasonably believed that MORALES also had a coconspirator within the apartment who had facilitated his entry to 18 Carleton Street prior to obtaining the orange bag containing the pills. From the time of the observations of MORALES entering and exit, investigators maintained physical surveillance of 18 Carleton Street and did not observe anyone coming or going from 18 Carleton Street.

**B.      ENTRY TO 18 CARLETON IN ANTICIPATION OF SEARCH
         WARRANTS**

9.      Approximately 20 minutes after seizing the drugs from MORALES at 4:36 pm, investigators began to knock and announce at the TARGET LOCATIONS. After waiting a reasonable amount of time at the exterior of the structure with no response, investigators forced entry and proceeded up a common area stairwell to the second floor. Investigators breached

another locked door before breaching a third door to the third-floor apartment. The apartment on the third floor was determined to be a one-bedroom unit, with a kitchen and living room.

10.     Investigators conducted a safety sweep of the apartment and observed large amounts of drugs and a pill press in plain view in a closet in the bedroom. The sweep did not locate any occupants, but investigators noted that there were clear and fresh footprints surrounding a spiral staircase leading down to the second floor. This spiral staircase was located in the living room and was not the staircase used by investigators to make entry into the apartment.

11.     The footprints were located in a field of powder layering the floor and were located immediately in front of a staircase leading downward. The footprints appeared fresh and led downward to the second floor. This powder appeared consistent with that used in the manufacturing of pills. A photo of the powder, staircase and footprints follows:



12.     Investigators proceeded down the spiral staircase and came to a door that led into the second-floor apartment.  The door to the second floor was locked but investigators heard movement within the second-floor apartment. Investigators knocked numerous times with no response and eventually forced entry.  Based on the layout of the structure and access points and police presence surrounding the structure, the occupants of the second floor could not have entered the premises from the outside while investigators were on scene.  Additionally, this spiral staircase was not observable from the exterior of the structure where investigators were situated.

13.     Investigators conducted a safety sweep of the second-floor apartment and encountered JOSE VASQUEZ LANTIGUA and MANUEL SANTANA-SOTO hiding in a bedroom. Both JOSE VASQUEZ LANTIGUA and MANUEL SANTANA-SOTO identified themselves as visitors that had arrived at 18 Carleton earlier in the day and were given access to the second-floor unit by the owner, who they refused to call in order to corroborate their story. Additionally, SANTANA-SOTO was observed wearing the grey New Balance flip flops, and VASQUEZ LANTIGUA was observed to be wearing the red Champion flip flops.

14.     Investigators noted that the flip flops which matched the size and impressions of the footprints observed upstairs in the powder.  Photographs of the footprints and the bottom of the New Balance flip flops worn by SANTANA-SOTO follow.



15.    Photographs of the footprints and the bottom of the red Champion flip flops worn by VASQUEZ LANTIGUA follow.



16.     Investigators also noted white dust on the hands of LANTIGUA and SANTANA. An example screenshot from a body worn camera showing powder on SANTANA's fingers follows:



17.    LANTIGUA and SANTANA-SOTO were both detained pending the issuance of federal search warrants for the second and third floor of 18 Carleton Street.  After being detained both subjects were asked to empty their pockets.  SANTANA-SOTO attempted to conceal keys which investigators later found on his person. These keys were later determined to unlock a door leading to the third-floor apartment. LANTIGUA was notably in possession of a law enforcement identification card from the Dominican Republic identifying him as a municipal police officer. Their footwear was seized as evidence. A photograph of the police credential follows:



## C.    SECOND FLOOR TENANT INTERVIEW

18.    While awaiting issuance of the federal search warrants, investigators spoke with the tenant of the second floor. The tenant, who I will refer to GDC, was not home at the time of the entry into the second-floor apartment and was at work when law enforcement made entry into her residence. GDC stated that she was the sole tenant of the second-floor unit at 18 Carleton Street and had been residing there for 9 years. GDC stated that her son is currently visiting but is only temporarily staying with her. GDC's son was also not present at the time law enforcement made entry into her residence

19.     GDC was shown pictures of LANTIGUA and SANTANA-SOTO. JDC stated that she had seen them around the exterior of the house, but they have never been inside of her apartment, nor had they ever received permission to enter. GDC also told investigators that LANTIGUA and SANTANA-SOTO did not have keys to her second-floor apartment. GDC further stated that there is no other lawful tenant of the second floor who had keys or could have provided them access.

20.     GDC stated she enters the second-floor apartment through the front door which she locks when she's away. Once through the front door, GDC stated that there is a staircase to the second level. On the landing there is a door to her apartment that she keeps unlocked. Opposite her apartment door is another door to access an emergency interior spiral staircase that goes to the third floor. It is at the top of these stairs that investigators found the footprints in white powder. This spiral staircase is is only accessible from within the second floor and third floor units.

21.     The door leading to the emergency staircase can only be opened from the third-floor side and is locked on her side of the apartment. Therefore, I believe that SANTANA-SOTO and LANTIGUA were able to flee the third-floor apartment and enter the second-floor apartment unimpeded and unobserved through this interior spiral staircase. Investigators had established a perimeter around the building before knocking. I believe that SANTANA-SOTO and LANTIGUA feared being apprehended by officers outside the building so chose to hide in the second-floor apartment. Based upon these facts, SANTANA-SOTO and LANTIGUA were charged with state offenses related to breaking and entering.

22.     After the issuance of the federal search warrants, SANTANA-SOTO and LANTIGUA were placed under arrest and transferred to the custody of Massachusetts State Police for booking and processing.

### D.    SEARCH OF THE THIRD-FLOOR APARTMENT OF 18 CARLETON STREET

23.    Following the issuance of the search warrant, investigators began to search the third-floor apartment.  Controlled substances, including suspected fentanyl and methamphetamine, and paraphernalia related to the manufacture and distribution of controlled substances (including a pill press) were found in the kitchen, bedroom, and living room.  In total, over 18,000 grams of suspected controlled substances were recovered, which are pending analysis at the DEA lab.

24.    The bedroom containing the pill press had a bed, dresser, closet with clothing, and a closet containing the pill press.  Investigators also found a bag with approximately eight respirator masks, which I know to be used in the manufacture of controlled substances.  The large number of masks suggests numerous people are engaged in the pill press operation as the masks are reusable with disposable filters.

25.    Based upon the large amount of drugs scattered throughout the apartment, both hidden and in plain view, and the industrial pill press found in the bedroom, any occupant would be plainly aware of the manufacturing operation occurring in this residence.  Furthermore, a notebook was found in the bedroom that appears to be a drug ledger.

26.    The following sections outline a summary of the items found in each of the three areas of the third-floor apartment.  Photographs follow.

#### a.    SEARCH OF THE KITCHEN

27.    In the kitchen, investigators observed multiple bowls containing powders, multiple blenders, scales, sifters, and bags containing powders consistent with those used in the manufacture and distribution of controlled substances. In the cabinets, investigators located cutting agents, dyes, and completed pills in plastic bags.  Photographs of the kitchen area and some of the items recovered follow:
























**b.    SEARCH OF THE BEDROOM**

28.    As noted above, the third-floor apartment had one bedroom.  Underneath the bed, investigators located a plastic bowl containing thousands of blue counterfeit Percocet pills believed to contain fentanyl.





29.    The bedroom closet contained an electric pill press that was bolted to a piece of furniture. Notably, a grease gun was hung to the left of the press.  Additionally, near the pill press was an air compressor and blue bowl with powder and a Vevor brand voltage converter.  The pill press and air compressor were being powered by the voltage converter. I believe this voltage converter was being utilized to ensure that the use of pill press did not cause any short circuits, overloads or otherwise affect the electric service at the property. In front of a closet across from the pill press closet, investigators located a piece of luggage that contained numerous respirators, tools and other implements used in the repair and maintenance of a pill press.  Within the pill press closet was a box containing numerous tools, and pill molds.





















30.     On the dresser in the bedroom, investigators located documents addressed to an individual who was identified to be the tenant of the third-floor unit ("3rd Floor Tenant"). Those documents included Massachusetts Department of Revenue documents, insurance documents, a Capital One statement, a VISA in the name of the 3rd Floor Tenant bearing his photograph and records relating to his green card. Also on the dresser, investigators located plastic wrapping on a spool, which is used to package controlled substances, and a drug ledger.



c.     **SEARCH OF THE LIVING ROOM**

31.     In the living room, investigators found numerous counterfeit pills, a quarter-kilogram press (used to form quarter-kilogram bricks), a large bag of powders used in pill manufacturing from LFA Tablet, a toolbox, and other paraphernalia used in the manufacturing process.

32.     In one corner of the living room, investigators located a cardboard box that contained pressed pills. Inside of that box, investigators located a second box that also contained pressed pills.











33.    In the corner behind the spiral staircase, investigators located a large box that contained pressed pills. These pills appeared to be counterfeit Adderall pills containing methamphetamine.





### d.    DOCUMENTS

34.    Investigators also located various documents on the third-floor. Among the

documents recovered were multiple documents bearing the name of JOSE VASQUEZ, listing an

Oakland Avenue address in Methuen, MA.





35.     As noted, the search resulted in numerous seized items.  Investigators field tested a portion of the drugs.  Many of the results were inconclusive, but there was at least one positive field-test for methamphetamine among the seized items.  In my experience pills typically field-test as inconclusive until examined at the DEA laboratory.

36.     Full analysis of the items seized during the arrest and search warrant is ongoing.  In summary, investigators seized over approximately 18 kilograms of fentanyl, methamphetamine, and other cutting agents.  Based on my experience I estimate that approximately 100,000 pills were seized.  Photographs of some of the items recovered during the search are depicted below:





### III.    CONCLUSION

37.    Based on the foregoing, there is probable cause to believe that on August 28, 2025, MANUEL SANTANA-SOTO, and JOSE VASQUEZ LANTIGUA violated 21 U.S.C. § 846 (conspiracy to manufacture, distribute and possess with intent to distribute, a controlled substance), and 21 U.S.C. § 841(a)(1) (manufacturing of a controlled substance, possession of a controlled substance with intent to distribute or manufacture).

I swear that the foregoing is accurate to the best of my knowledge, information and belief.

_Eric D. Poalino /by Paul G. Levenson_
Special Agent Eric D. Poalino
Federal Bureau of Investigation

Electronically sworn to and subscribed telephonically in accordance with Federal Rule of Criminal Procedure 4.1 on _____September 15_____, 2025.

Hon. Paul G. Levenson
United States Magistrate Judge